UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

ISO DEVELOPERS, INC. D/B/A ISODOCS,

Plaintiff,

C.A. NO. 1:16-cv-12411-ADB

v.

ROBERT ERRATO and
UNITE SOCIAL, LLC,

Defendants.

## DEFENDANTS' ANSWER TO AMENDED COMPLAINT AND COUNTERCLAIMS AND THIRD-PARTY COMPLAINT

### Parties

1.  The Defendants are without knowledge sufficient to admit or deny the allegations contained in this paragraph of the Plaintiff's Amended Complaint.

2.  The Defendants admit that Errato is a citizen of the State of Connecticut who resides at 3490 Whitney Avenue, Hamden, Connecticut 06518. The Defendants admit that at times relevant hereto, Errato engaged ISO to develop a mobile application known as Unite.Social. The Defendants admit that Unite Social, LLC is a Delaware limited liability corporation, and that it was formed on March 15, 2016, and that, at times, Errato acted as a an agent of USC. The Defendants are without knowledge sufficient to admit or deny the remaining allegations contained in this paragraph of the Plaintiff's Amended Complaint.

3.  The Defendants admit that Unite Social, LLC is a Delaware limited liability corporation, and that it was formed on March 15, 2016. The Defendants admit that the members of USC are Errato's sons, Christopher, Stephen and a third son. The Defendants are without knowledge sufficient to admit or deny the remaining allegations contained in this paragraph of the Plaintiff's Amended Complaint.

### Jurisdiction

4.  Admitted.

5.  The Defendants admit that venue is proper. The Defendants admit the allegations contained in the second sentence of this paragraph of the Plaintiff's Amended Complaint. The Defendants deny the remaining allegations contained in this paragraph of the Plaintiff's Amended Complaint.

6.  The Defendants admit that the allegations in the Plaintiff's Amended Complaint derive out of a common nucleus of operative facts, and the claims are such that they would ordinarily be expected to be tried in one judicial proceeding.  The Defendants are without knowledge sufficient to admit or deny the remaining allegations contained in this paragraph of the Plaintiff's Amended Complaint.  Further responding, the Defendants state that they do not oppose the Plaintiffs' request that this Court exercise pendent jurisdiction over the state law claims.

7.  The Defendants are without knowledge sufficient to admit or deny the allegations contained in this paragraph of the Plaintiff's Amended Complaint.

8.  Denied.

9.  Denied.

10.  Denied.

11.  Denied.

12.  The Defendants admit that, at times, ISO asked Errato to make some payments either directly to a third party vendor or to ISO on invoices generated for the work which ISO claimed had been performed. Deny remaining

13.  Denied.

14.  The Defendants admit that Errato is engaged in a divorce proceeding in a Connecticut Court.  The Defendants are without knowledge sufficient to admit or deny the remaining allegations contained in this paragraph of the Plaintiff's Amended Complaint.

15.  Denied.

16.  Denied.

17.  The Defendants are without knowledge sufficient to admit or deny the allegations contained in this paragraph of the Plaintiff's Amended Complaint.

18.  The Defendants are without knowledge sufficient to admit or deny the allegations contained in this paragraph of the Plaintiff's Amended Complaint.

19.  The Defendants deny that Errato promised payment of $2,000,000, or made promises of investments, as alleged.  The Defendants admit that Errato never paid ISO $2,000,000.  The Defendants state that ISO's actions have harmed the Defendants' ability to solicit investment funds.

20.  Denied.

21.  Denied.

22.  Denied.

23. Denied.

24. Denied.

25. Denied.

26. Denied.

27. Denied.

28. The Defendants are without knowledge sufficient to admit or deny the allegations contained in this paragraph of the Plaintiff's Amended Complaint.

29. Denied.

30. Denied.

31. Denied.

32. Denied.

33. Denied.

34. The Defendants do not respond to the allegations contained in this paragraph of the Plaintiff's Amended Complaint because they refer to a document or documents that speak for themselves. To the extent that an affirmative response is required, the Defendants deny those allegations and call upon the Plaintiffs to prove the same.

35. Denied.

36. Denied.

37. Denied.

## Count I – Breach of Contract
## (ISO v. Errato)

38. The Defendants repeat, reiterate, and incorporate by reference each and every admission, denial or other response as to each and every allegation contained in the referenced paragraphs with the same force and effect as if each were separately set forth herein at length.

39. Denied.

40. Denied.

41. Denied.

42. Denied.

3

43. Denied.

## Count II– Fraudulent Conveyance

44. The Defendants repeat, reiterate, and incorporate by reference each and every admission, denial or other response as to each and every allegation contained in the referenced paragraphs with the same force and effect as if each were separately set forth herein at length.

45. Denied.

46. The Defendants deny the allegations contained in the first sentence of this paragraph of the Plaintiff's Amended Complaint.   The Defendants admit the allegations contained in the second sentence of the Plaintiff's Amended Complaint.

47. Denied.

48. Denied.

49. Denied.

50. The Defendants are without knowledge sufficient to admit or deny the allegations contained in this paragraph of the Plaintiff's Amended Complaint.

51. Denied.

52. Denied.

53. Denied.

54. Denied.

## Count III – Unjust Enrichment
## (ISO v. Unite Social, LLC)

55. The Defendants repeat, reiterate, and incorporate by reference each and every admission, denial or other response as to each and every allegation contained in the referenced paragraphs with the same force and effect as if each were separately set forth herein at length.

56. Denied.

57. Denied.

58. Denied.

59. Denied.

## Count IV –Detrimental Reliance
## (ISO v. Errato)

60. The Defendants repeat, reiterate, and incorporate by reference each and every admission, denial or other response as to each and every allegation contained in the referenced paragraphs with the same force and effect as if each were separately set forth herein at length.

61. Denied.

62. Denied.

63. Denied.

64. Denied.

## Count V –Civil Fraud
## (ISO v. Errato)

65. The Defendants repeat, reiterate, and incorporate by reference each and every admission, denial or other response as to each and every allegation contained in the referenced paragraphs with the same force and effect as if each were separately set forth herein at length.

66. Denied.

67. Denied.

68. Denied.

69. Denied.

70. Denied.

71. Denied.

## Count VI –M.G.L. c. 93A
## (ISO v. Errato and Unite Social, LLC)

72. The Defendants repeat, reiterate, and incorporate by reference each and every admission, denial or other response as to each and every allegation contained in the referenced paragraphs with the same force and effect as if each were separately set forth herein at length.

73. Denied.

74. Denied.

75. Denied.

76. Denied.

**"Prayers for Relief"**

The Defendants deny that the Plaintiff is entitled to the relief they seek, and further deny that the Plaintiff is entitled to any relief.

To the extent not specifically admitted or denied in the preceding responses, the Defendants deny all allegations contained in Plaintiff's Amended Complaint.

WHEREFORE, the Defendants respectfully request that this Court dismiss all claims of the Plaintiff's Amended Complaint, deny the Plaintiff's requested relief and any relief whatsoever, enter judgment in favor of Defendants, and award Defendants their costs, reasonable attorneys' fees, and such other relief as this Court deems just and proper.

**Jury Demand**

The Defendants demand a trial by jury by the maximum number of jurors permitted by law, with respect to the Plaintiff's claims in the Amended Complaint..

## AFFIRMATIVE DEFENSES

### First Affirmative Defense

By way of an affirmative defense, each Defendant says that, under the doctrine of "unclean hands", the Plaintiff is entitled to no relief.

### Second Affirmative Defense

By way of affirmative defense, each Defendant says that if the Plaintiff suffered injuries or damage, as alleged, such injuries or damage were caused by someone for whose conduct that Defendant was not and is not legally responsible.

### Third Affirmative Defense

By way of an affirmative defense, each Defendant says that some or all of the Plaintiff's claims are barred or limited by the statute of limitations.

6

### Fourth Affirmative Defense

By way of an affirmative defense, each Defendant says that, under the doctrine of estoppel, or waiver, the Plaintiff is entitled to no relief.

### Fifth Affirmative Defense

The Defendants are entitled to recover reasonable costs and expenses and attorney's fees because some or all of the claims brought by the Plaintiff are insubstantial, frivolous and brought in bad faith.

### Sixth Affirmative Defense

By way of an affirmative defense, each Defendant says that, under the doctrine of laches, the Plaintiff is entitled to no relief.

### Seventh Affirmative Defense

By way of affirmative defense, each Defendant says that if the Plaintiff suffered any damages, the Plaintiff failed to mitigate its damages.

### Eighth Affirmative Defense

By way of affirmative defense, each Defendant says that the Plaintiff has suffered no damages, including any damage to any contractual relations, as a result of any conduct of the Defendant, is thus barred from asserting any claim against the Defendants.

### Ninth Affirmative Defense

By way of affirmative defense, each Defendant says that the Plaintiff has failed to plead fraud with sufficient particularity.

### Tenth Affirmative Defense

By way of affirmative defense, each Defendant says that some or all of the Plaintiff's claims fail to state a claim under which relief can be granted, and should be dismissed under fed. R. Civ. P. 12(b)(6).

7

### Eleventh Affirmative Defense

By way of affirmative defense, each Defendant says that some or all of the Plaintiff's claims are barred, in whole or in part, because Defendant's conduct was not outrageous or egregious.

### Twelfth Affirmative Defense

By way of affirmative defense, each Defendant says that some or all of the Plaintiff's claims are barred, in whole or in part, because Defendant's conduct was not unfair, deceptive, or fraudulent.

### Thirteenth Affirmative Defense

By way of affirmative defense, each Defendant says that some or all of the Plaintiff's claims are barred, in whole or in part, by the economic loss doctrine.

### Fourteenth Affirmative Defense

By way of affirmative defense, each Defendant says that some or all of the Plaintiff's claims are barred, in whole or in part, by the doctrines of set off or recoupment.

## COUNTERCLAIMS AND THIRD-PARTY COMPLAINT

Defendants/Counterclaim Plaintiffs, Robert Errato and Unite Social LLC, pursuant to Rules 13 and 14 of the Federal Rules of Civil Procedure, and as counterclaims against Plaintiff/Counterclaim Defendant ISO Doc, Inc. d/b/a ISO Developers, and as third-party claims against the Third-Party Defendant, David Whitaker, state as follows:

### Parties

1.  The Plaintiff in Counterclaims, Robert Errato ("Errato"), is a resident of Connecticut.

2.  The Plaintiff in Counterclaims, Unite Social, LLC ("Unite Social") is a Delaware limited liability corporation with a principal place of business located at 24 Brock Street, North Haven, CT.

3.  The Defendant in Counterclaims, ISO Developers, Inc. ("ISO"), is a New York corporation with a principal place of business in Massachusetts.

4.  The Third-Party Defendant, David Whitaker ("Whitaker"), is an individual who, upon information and belief, resides in the Boston, Massachusetts vicinity.

### Jurisdiction

5.  This Court has jurisdiction over the subject matter of Errato's counterclaims and third–party complaint, pursuant to 28 U.S.C. § 132, because the parties are citizens of different states and the amount in controversy exceeds $75,000.

6.  This Court has personal jurisdiction over ISO because ISO has its principal place of business in the Commonwealth and, pursuant to Mass. G.L. c. 228A, § 3(a), because this action arises out of ISO's transaction of business within the Commonwealth of Massachusetts. Further, by bringing suit in the Commonwealth of Massachusetts, ISO has consented to personal jurisdiction in the Commonwealth.

7.  Venue is proper in this Court, pursuant to 28 U.S.C. § 1391, because a substantial part of the events and omissions giving rise to Errato's counterclaims occurred in this judicial district, and because the Court has personal jurisdiction over ISO.

### Background

8.  In or about early February 2014, Errato had an idea to create a mobile software application, called "Thigh Gap" or "High Thigh Gap."

9.  In an effort to hire a software developer to design that application, Errato submitted a request for bid through an internet website called "Elance."

9

10. The Elance website service which allowed an individuals or company ("Client") to post requests for software development through its on line portal, where potential developers could review the request and submit bids—through the Elance web portal--to do the work.  If a contract was ultimately consummated, the Client would pay the contract money to Elance, which deducted a fee for its service before paying the developer.

11. In response to his request, Errato received more than ten bids, including a bid from an individual named David Whitaker ("Whitaker"), who was associated with a business that called itself "The Best Website Developer."

12. The contract bid price was $6,500, with "delivery within 3 months."  That bid was submitted on February 4, 2014.

13. At that point in time, Errato had never heard of ISO.  He did not receive a bid from ISO.  He never learned that "The Best Website Developer" was even a corporation.  At times, Whitaker would email him with information that indicated he was working for a business called "Design Geeks."

14. Whitaker's bid was sent to Errato on February 4, 2014.  After some further communication with Mr. Whitaker about the project, Errato accepted that bid.

15. Whitaker requested a $1,500 deposit before he would begin to start working.  Errato paid that sum.

16. Shortly thereafter, Errato paid Whitaker another $1,500, based on his representation to Errato that the development stage was complete.  Thereafter, however, Whitaker informed Errato that he was unable to build the software application.

17. Errato demanded his $3,000 back, and Whitaker agreed to do so.  However, Whitaker subsequently told Errato that he could not refund him the money, because his business partner had already spent the money and was either filing bankruptcy or otherwise did not have the money to pay Errato back anymore.

18. Instead, Whitaker proposed that he could make it up to Errato by offering him discounted hourly rates on future software development projects.

19. Errato continued to do business with Whitaker.  At that time, he did not know that Whitaker had been convicted of federal crimes.

20. After the Thigh Gap application project was abandoned, Errato engaged Whitaker to develop a web application called, "HottieBody."  Shortly thereafter, in 2015, Errato engaged Whitaker to also develop an application called "Unite Social."

21. There was no initial formal written Statement of Work, but Errato and Whitaker discussed the essential requirements of the application many times.  Unite Social was to be an application that would allow a social media user to combine all of their social media and manage it on one platform.  It would allow them to view all of their various social media accounts in real

time, and to post to one or more of them with text or pictures. The outlines of this were discussed many times with Whitaker in 2015. Whitaker provided mock-ups.

22. On or about June 29, 2015 Whitaker sent an email to Errato outlining the required functionality of the Unite Social application. It was in or about mid-2015 when Errato first heard the name, "ISO", and Whitaker's association with that company. Before that time, Errato had no dealings with ISO. However, after that time, Whitaker and another person at ISO, Abi Farrand, continued to work on the application through ISO, and ISO invoice Errato from time to time, and Errato paid invoices to ISO for that work.

23. The relationship thereafter consisted of a pattern of Whitaker asking for more money, and promising that the software application was nearly complete. Eventually, however, Whitaker admitted that he could not develop the Hottie Body application, either.

24. On or about September 8, 2015 Whitaker sent an email to Errato describing the Hottie Body application and confirming that "[t]he development of this mobile application has been paid in full." That letter further describes features and functions that ISO ultimately never delivered. At the end, Whitaker stated that an additional $1,000 would be needed to expedite the move to the Amazon server, and an additional $3,000-$5,000 would be needed for user testing and test users.

25. Over time, ISO and Whitaker frequently represented that the application was nearly complete, but they need a little more money and a little more time to accomplish that. However, despite paying for the additional work, ISO continued to fail to deliver an application that included the basic core essential functionality.

26. Towards the end of 2015, however, ISO and Errato had discussions about how much time and money would be required, and how much Errato owed ISO for past work performed.

27. In late December 2015, ISO told Errato that many of his past credit card payments were not being accepted by ISO's credit card processing company. So, ISO asked Errato to sign a document stating that he had in fact authorized those credit card payments.

28. Attached to that document were printouts purporting to show invoices that Errato had "paid," which, by signing that agreement or document he was affirming he had in fact authorized the credit cards to pay. Also, there were other purported invoices described, which Errato had never seen before and which Errato had not authorized.

## Scope of Work Modification Request and Funding Agreement; Wire Transfers

29. During December 2015 and early January 2016, there were many communications between Errato and ISO about how much was due and owing for the work they had done and would do to finish the Unite Social program. Errato and ISO reached an agreement on how much more Errato would have to pay to complete that. That culminated in the signing of the "Scope of Work Modification Request and Funding Agreement." Attached hereto as **Exhibit 1** is a true and accurate copy of that agreement. Under that agreement, the only other amounts that

Errato was obligated to pay would be $30,000.00.  They promised to deliver the final product "on or before Monday, January 26, 2016."

30. That agreement reiterates the basic core functionality that would be required in that software application.  Errato paid the $30,000.00, by wire transfer.  However, consistent with past patterns and practice, Whitaker and ISO continued with their pattern of promising to be very close to finishing the project, if only Errato would send more money.  This continued repeatedly throughout 2016.

31. To date, ISO has utterly failed to produce an application that meets those basic core functionality requirements.

32. Typically, ISO asked Errato to pay in advance for its work.  Over time, up through about May 2016, Errato paid a total of approximately $300,000.00 to Whitaker and/or ISO.

33. On or about May 17, 2016,  Jonathan Kavner ("Kavner"), of ISO, sent an email to Errato.  In that email, Kavner told Errato--for the first time--that ISO was carrying an unpaid balance for work it had previously done for Errato.  This was news to Errato.  Attached to that email was purported to be a printout of "unbilled" invoices of various dates between November 20, 2015 and May 17, 2016.  Errato was shocked to receive this.

34. Despite the agreement in January 2016 that a completed application would be delivered by ISO in January, for only $30,000 more, ISO was now claiming "old" "unbilled" invoices and additional invoices totalling nearly ten times that much.

35. The claimed invoices were knowingly false statements of work that had been performed and/or moneys owed by Errato.

36. As of that date, the application still lacked basic core functionality.

37. ISO threatened to cancel the project altogether, if Errato did not continue to pay more money to it.

38. In May 2016, Kavner, on behalf of ISO, requested that Errato loan $30,000, to be repaid in weekly installments of $10,000 until the amount was returned, in order to help fund an unexpected large amount of payroll and overtime hours.

39. In reliance on this promise to repay that loan, Errato transferred by wire transfer $30,000 to ISO's account, shortly thereafter.

40. Errato's reliance on Kavner's promise of repayment, was reasonable.

41. ISO never repaid Errato the $30,000.

## Credit Agreement

42. In or about June 2016, ISO contacted Errato and told him that ISO had inadvertently breached the confidentiality of our project with a third party. This greatly upset Errato. Errato believed that he may have suffered great economic harm by this stated breach of confidentiality.

43. After further discussion, to negotiate a settlement of potential damages claims, the parties entered into a new contract, entitled "Credit Agreement." Attached hereto as **Exhibit 2** is a true and accurate copy of that agreement.

44. Under the Credit Agreement, ISO credited Unite Social/Errato $500,000.00 worth of services, to be paid in the form of a discount on future billings, but if the contract were terminated or the development ended, ISO would pay Errato the unpaid balance.

45. ISO terminated the contract, and the development has ended.

## Fake Facebook Executive Emails

46. In late 2014 and early 2015, while Mr. Whitaker was still doing Errato's work under "Design Geeks," Whitaker commonly referred to supposed interest from Facebook in purchasing Errato's software application, but suggested that Errato needed to pay him more money to do more work on the application to get it to a point that they could credibly demonstrate its features to Facebook. Specifically, during these times and thereafter, Whitaker referred to emails that he and Errato had received from two Facebook executives, stating that they had been tasked to try to purchase Errato's software application. Their email addresses had the domain names, "facebook-acquisition.com" and "FBexeinv.com:" "charlesjohnson@facebook-acquisition.com."

47. Investigation conducted on my behalf in late 2016, including the use of the Web-based service, Domain Tools, uncovered the history of the creation and ownership of the domains from which those "Facebook" emails were sent. The investigation shows that the domains, "facebook-acquisition.com" and "fbexeinv.com," from which those emails were sent were created in each case on the very same day that Errato received his first email from each of those "individuals" and were created on servers owned and controlled by Whitaker and Design Geeks.

48. Whitaker or someone on his behalf, created domain names, "facebook-acquisition.com" and "FBexeinv.com," and then engaged in a prolonged effort (in each case) to try to convince Errato that Facebook was likely to pay Errato a tremendous amount of money for a completed application, so that Errato would continue to pay Whitaker and/or Whitaker's company the money it demanded to continue work on the project.

49. In October 13, 2014, at 12:59 p.m., Errato received an email from someone purporting to be "Charles Johnson" from "FB ACQ," with an email address of "charlesjohnson@facebook-acquisition.com," who implied that his company was interested in purchasing the ownership rights to Errato's software application or otherwise entering into a business relationship with him. That email was cc'd to Whitaker. This was the beginning of sporadic email exchanges

13

over the next 2-3 weeks between Errato and whoever was sending emails from that domain account under the name, "Charles Johnson."

50. At numerous points in time during Whitaker/ISO's work on the Unite.Social software application project, Whitaker threatened to shut down development if Errato refused to pay ISO more money, after Errato raised questions about the adequacy of application's poor functionality and/or its lack of core features. A common pattern emerged: Whitaker/ISO promised that any failings were "bugs" which would be easily and quickly fixed (but which were not), or that it would only take a little more money and time to complete the project.

51. Whitaker's representations and communications with Errato on this project were done on behalf of ISO.

### Whitaker's Personal Use of Errato's Credit Card

52. Shortly after Errato received the first "Charles Johnson" email, Errato received an American Express monthly statement with approximately $35,000 worth of various charges for things such as food, Armani clothes, tickets to events, and Home Depot purchases, which he had not made or authorized and had not even been made aware of. Errato spoke with Whitaker about them and Whitaker told him that they were Whitaker's charges, and that he did not know why they had been charged to Errato's credit card. Whitaker told Errato that he thought that perhaps Errato's credit card number was erroneously linked to Whitaker's Apple Pay account.

53. Whitaker promised to straighten it out and have Errato's account credited for those purchases.

54. He did not make any effort to reverse those charges or otherwise arrange a credit to Erato's account.

55. Errato's account was never credited for those purchases.

56. Shortly thereafter, Errato received the first of the "Charles Johnson" emails. From that point on, Whitaker sometimes told Errato that he was working on straightening things out with the credit card charges.

57. At other times, Whitaker convinced Errato to focus on finishing the project, because of Facebook's supposed expressed interest in purchasing it.

58. Whitaker started sending the fake Facebook executive emails to Errato with the intent to distract Errato from the unauthorized charges that Whitaker had charged to Errato's credit card. To date, despite demand, Whitaker has never paid Errato back.

### Google Ad Words/LinkedIn Fraud

59. In mid-August, 2016, Whitaker asked Errato to pay for Google Ad Words service on behalf of ISO, stating that the amount paid would be credited towards whatever invoices ISO was charging Errato for its work. Whitaker said that ISO was short on money, and this would be a quick way to increase revenue for ISO, so it could continue working on the Unite.Social

14

software project. Errato agreed to pay the $5,000, since it was to be deducted from his ISO invoices, anyway.

60. Thereafter, on August 16, 2016, Whitaker sent Errato an email with a web link (https://www.jotform.us/form/62283756276162?preview=true) to fill out, for the credit card payment. In his email, Whitaker said that this is "the same system we use for you to pay freelancer's [sic] directly from time to time." Attached hereto as **Exhibit 8** is a true and accurate copy of that email from Whitaker.

61. Errato clicked on that link and filled out that form, authorizing a one-time payment of $5,000 on his credit card information. Errato thought, however, that when he entered his credit card information on that web form, that he was sending it to a credit card processor—not to ISO, because of what Whitaker had told him in his August 16, 2016 email.

62. After Errato completed and submitted the form, Errato received what appeared to be an automatic reply email, providing him with a receipt for what he had filled out. Attached hereto as **Exhibit 9** is a true and accurate copy of that email (the actual credit card information has been redacted for the purpose of filing it in the public record in this case.) When the email is viewed on Errato's computer, it contains a line, "Reply-to: canyoukeepup@icloud.com." When Errato prints it out, however, that line disappears. A true and accurate copy of a photograph of the receipt as it appears on the computer screen is the first page of **Exhibit 9**; the second page is the email after printing it.

63. That "canyoukeepup" nomenclature is one that Whitaker used in connection with Design Geeks. (See, Ex. 7, p. 23)

64. When Errato received his next American Express credit card monthly statement, in late August 2016, however, it listed approximately $41,000 worth of Google Ad Word charges.

65. Errato had not communicated directly with Google with respect to authorizing that charge.

66. Errato had not filled out any Google on line forms for information, relating to the authorization of that charge.

67. Prior to August 29, 2016, Errato called Whitaker about those charges. Errato told Whitaker that he had not authorized those charges (other than the agreed $5,000). Whitaker told him that Errato must have checked off or failed to check off an appropriate box when filling out the Google Ad Words processing forms.

68. Errato denied that, as he had not communicated with Google, had never seen any such forms, and had not filled any of them out. Whitaker told Errato that he would call Google and have the charges switched over to ISO's credit account. Whitaker told Errato that ISO had a $1.5 million credit line with Google. Whitaker told Errato he would straighten it out.

69. Errato told Whitaker that he had no choice but to contact American Express to challenge the charges as being unauthorized, because he had not authorized them and they were for a great deal of money. Whitaker said that he understood.

70. In Errato's conversations with American Express, the American Express representative told him that Google had investigated the charges and had provided American Express with information which justified the charges as having been authorized by Errato, and that therefore, American Express would deny Errato's request for a chargeback of the $36,000 that he had disputed. The representative said that Google had informed American Express that its investigation showed that Errato had directly requested the charges, and had been in continuous communication with Google about the ongoing charges. Errato denied that, because it was not true. Errato asked the American Express representative to send him the backup information/documentation that Google had sent to American Express.

71. Errato received that documentation in November 2016. A true and accurate copy of the Google documentation of its Ad Words investigation, which it sent to American Express (and American Express sent to Errato), is attached hereto as **Exhibit 10**.

72. The Google documentation listed Errato as "Project Manager, ISO Developers."

73. Errato has have never been "Project Manager" at ISO.

74. Errato has never been employed or otherwise affiliated with ISO.

75. Errato has never been a software development project manager for any company. Errato would not even know how to do that type of work.

76. The Google documentation cited in support of its belief that Errato was Project Manager at ISO indicated that they referenced a web link to LinkedIn.com profile for "Robert Errato." Clicking on the link led to a LinkedIn page that listed "Robert Errato" as "Project Manager ISO Developers," and bore ISO's logo:



A copy of that fake LinkedIn profile is included in Google's documentation.

77. That is not Errato's LinkedIn profile. Errato never created that LinkedIn profile. Errato was unaware of its existence until he received the Google documentation from American Express.

78. The Google documentation cited in support of its belief that Errato was Project Manager at ISO also refers to a link to ISO's Facebook web page.

79. Clicking on that link leads to a page on ISO's site that shows two men talking to eachother. Neither one of those men is Errato.

80. The Google documentation also listed Errato's address as 354 Main Street, Winthrop, MA 02512, and Google noted that that address matched ISO's Facebook site information. "Thus, this is the same customer to whom we rendered services," Google noted.

81. That address is not Errato's cardholder address; that address is ISO's address.

82. The Google documentation also stated that "The cardholder has also been in continuous conversations with Google on his account indicating the active conversations and management of his account."

83. Errato has never spoken with or communicated with Google about this account, ISO, Ad Words, or anything other than setting up a Gmail account a long time ago.

84. The Google documentation also stated that "On August 29, 2016, the cardholder contacted Google once again asking if their pending credit card billing charges could be moved to monthly invoicing and were clearly informed that this was not possible."

85. Errato never contacted Google about the charges; Errato contacted only American Express.

86. Whitaker and/or someone else on behalf of Whitaker and/or ISO created a Linked In profile with the intent to deceive Google and/or others into thinking that Errato was employed or affiliated with ISO and/or authorized the Google Ad word charges, for ISO's benefit.

### Count I – Breach of Oral Contract
### (Unite Social and Errato v. ISO)

87. Unite Social and Errato repeat and reallege each and every paragraph of the Counterclaims herein.

88. Errato and ISO entered into valid binding oral contract for the performance of professional services.

89. The oral contract was supported by good and valid consideration.

90. Unite Social and Errato performed their obligations under the contact with ISO.

91. ISO breached that contract by failing to perform the contracted services, including but not limited to, failing to deliver promised services, including failing to deliver a software product that contains the agreed-to core functionality.

92. As a result of ISO's breach, Unite Social and Errato each has suffered and continues to suffer monetary damages, including all sums paid to or on behalf of ISO.

## Count II – Breach of Contract
## ("Scope of Work Modification Request and Funding Agreement")
## (Errato v. ISO)

93. Unite Social and Errato repeat and reallege each and every paragraph of the Counterclaims herein.

94. The aforementioned "Scope of Work Modification Request and Funding Agreement" constitutes a valid binding contract between Errato and ISO for the performance of professional services.

95. The contract was supported by good and valid consideration.

96. Errato performed his obligations under the contact with ISO.

97. ISO breached that contract by failing to perform the contracted services.

98. As a result of ISO's breach, Errato has suffered and continues to suffer monetary damages, including all sums paid to or on behalf of ISO.

## Count III – Breach of Contract
## (Credit Agreement)
## (Unite Social and Errato v. ISO)

99. Unite Social and Errato repeat and reallege each and every paragraph of the Counterclaims herein.

100. The aforementioned Credit Agreement constitutes a valid binding contract between Unite Social and/or Errato and ISO for the performance of professional services.

101. The contract was supported by good and valid consideration.

102. Unite Social and Errato performed their obligations under the contact with ISO.

103. Under the terms of that contract, ISO owes Unite Social and/or Errato money in an amount to be determined.

104. As a result of ISO's breach, Unite Social and Errato each has suffered and continues to suffer monetary damages, including all sums paid to or on behalf of ISO.

## Count IV -Fraudulent Misrepresentation
## (Unite Social and Errato v. ISO)

105. Unite Social and Errato repeat and reallege each and every paragraph of the Counterclaims herein.

106. Whitaker and ISO defrauded Unite Social and Errato out of significant amounts of money by falsely representing that they were doing work on the application, by submitting false invoices to Errato, and by falsely representing that they were nearly done with the application, when

18

they knew that they had not done the required work and were not close to completing the work.

107. In order to induce Unite Social and Errato into paying the amounts of money described above, Whitaker, on behalf of ISO, made material, fraudulent misrepresentations about ISO's ability to design and develop a software program that would include the agreed-to core functionality.

108. In order to induce Unite Social and Errato into paying the amounts of money described above, ISO, including Whitaker on behalf of ISO, made material, fraudulent misrepresentations about the services it had performed, including the amount of time spent, the costs, the quality of its work, and the functionality of the product.

109. Whitaker and ISO made the aforesaid misrepresentations intentionally or in reckless disregard of their falsity, in order to induce Unite Social and Errato into paying money to or on behalf of ISO, as described above.

110. The aforesaid misrepresentations were misrepresentations of material fact.

111. Unite Social and Errato reasonably relied on those misrepresentations, in deciding whether to pay money and/or continue to pay money to or on behalf of ISO to design and develop the software program described above.

112. But for Whitaker's and ISO's fraudulent misrepresentations, Unite Social and Errato would not have paid money or continued paying money to or on behalf of ISO to design and develop the software program described above.

113. As a result of the fraudulent misrepresentations, Unite Social and Errato each has suffered and continues to suffer great harm.

**Count V -Negligent Misrepresentation**
**(Errato v. ISO)**

114. Unite Social and Errato repeat and reallege each and every paragraph of the Counterclaims herein.

115. ISO had a duty to investigate and verify each and every representation made by its representatives, to ensure that the representations accurately reflected the ISO's capabilities, about ISO's ability to design and develop a software program that would include the agreed-to core functionality, about the services it had performed, including the amount of time spent, the costs, the quality of its work, and the functionality of the product.

116. In order to induce Errato into paying the amounts of money described above, ISO's representatives made material misrepresentations, as described above.

117. ISO's representatives made the aforesaid misrepresentations in negligent disregard of their falsity, in order to induce Errato into paying the amounts of money described above.

118. Unite Social and Errato did rely on those misrepresentations, in deciding whether to select the Defendant to design and develop the software program described above.

119. The aforesaid misrepresentations were misrepresentations of material fact.

120. Unite Social and Errato reasonably relied on those misrepresentations, in deciding whether to pay money and/or continue to pay money to or on behalf of ISO to design and develop the software program described above.

121. But for Whitaker's and ISO's misrepresentations, Unite Social and Errato would not have paid money or continued paying money to or on behalf of ISO to design and develop the software program described above.

122. As a result of the misrepresentations, Unite Social and Errato each has suffered and continues to suffer great harm.

### Count VI – Unjust Enrichment
### (Unite Social and Errato v. ISO)

123. Unite Social and Errato repeat and reallege each and every paragraph of the Counterclaims herein.

124. ISO's misrepresentations about ISO's ability to design and develop a software program that would include the agreed-to core functionality, that it's product included or would include the agreed-to core functionality, and about the services it had performed, including the amount of time spent, the costs, the quality of its work, and the functionality of the product were material, fraudulent misrepresentations.

125. At the time that ISO representatives made those misrepresentations, they knew they were false and that Errato would rely on them.

126. Unite Social and Errato reasonably relied on these misrepresentations to his detriment.

127. As a result, Unite Social and Errato has suffered and continues to suffer great harm, and ISO has been unjustly enriched.

### Count VII – M.G.L. c. 93A
### (Unite Social and Errato v. ISO)

128. Unite Social and Errato repeat and reallege each and every paragraph of the Counterclaims herein.

129. ISO conducts trade or commerce in the Commonwealth of Massachusetts so as to come within the purview of M.G.L. c. 93A.

130. By its actions and misrepresentations described herein ISO engaged in an unfair and deceptive business practice violating M.G.L. c. 93A, Section 11.

131. The acts and omissions of ISO as set forth above, are unfair and deceptive trade practices, which were undertaken knowingly and willfully.

132. Unite Social and Errato have suffered and will continue to suffer damages in an amount to be determined for money paid to or on behalf of ISO, due to ISO's conduct.

### Count VIII – Wire Fraud
### (Errato v. ISO)

133. Unite Social and Errato repeat and reallege each and every paragraph of the Counterclaims herein.

134. On one or more occasion, ISO, through its employees or representatives' fraudulent misrepresentations or actions, induced Errato to pay significant sums of money via wire transfer to ISO.

135. ISO did so with intent to deceive or defraud Errato.

136. It was reasonably foreseeable that Errato would use interstate wire communications to mak the payments to ISO.

137. Errato did, in fact, use interstate wire communications to make the payments to ISO.

### Prayers for Relief against ISO

WHEREFORE, Unite Social and Errato respectfully requests that this Court enter the following relief:

    (a)    enter judgment in favor of Unite Social and Errato against ISO for damages and/or restitution, in an amount to be determined by the Court, plus costs, pre- and post-judgment interest, and attorney's fees;

    (b)    enter judgment under Count VII (Chapter 93A) in favor of Unite Social and Errato against ISO, and determine that the violation of G.L. c. 93A by ISO was knowing and/or willful, and award Unite Social and Errato treble damages, costs and attorney's fees incurred as a result of the ISO's violations of G.L. c. 93A.

    (c)    grant such other relief as this Court may deem appropriate.

### Jury Demand

Unite Social and Errato demand a trial by jury by the maximum number of jurors permitted by law with respect to each Counterclaim, to the extent allowed by law.

## THIRD PARTY COMPLAINT

Third-Party Plaintiff, Robert Errato, asserts the following as third-party claims against the Third-Party Defendant, David Whitaker, states as follows:

## COUNT I

### FRAUD
**(Errato v. Whitaker)**

1. Errato repeats and realleges each and every paragraph of the Counterclaims herein.

2. In order to induce Errato into paying the amounts of money described above, Whitaker, on his own behalf, made material, fraudulent misrepresentations about his ability to design and develop a software program that would include the agreed-to core functionality.

3. In order to induce Errato into paying the amounts of money described above, Whitaker made material, fraudulent misrepresentations about the services he or others on his behalf had performed, including the amount of time spent, the costs, the quality of its work, and the functionality of the product, and engaged in a scheme to set up fake email accounts, intending to trick Errato into believing that Facebook was close to offering a significant sum of money for an interest in or purchase of the software that Whitaker was supposed to be designing and building for Errato.

4. Whitaker made the aforesaid misrepresentations intentionally or in reckless disregard of their falsity, in order to induce Errato into paying money, as described above.

5. The aforesaid misrepresentations were misrepresentations of material fact.

6. Errato reasonably relied on those misrepresentations, in deciding whether to pay money and/or continue to pay money to design and develop the software program described above.

7. But for Whitaker's fraudulent misrepresentations, and actions, Errato would not have paid money or continued paying money to design and develop the software program described above.

8. As a result of the fraudulent misrepresentations, and actions, Errato has suffered and continues to suffer great harm.

**Prayers for Relief against ISO**

WHEREFORE, Errato respectfully requests that this Court enter the following relief:

(a)     enter judgment in favor of Errato against Whitaker for damages and/or restitution, in an amount to be determined by the Court, plus costs, pre- and post-judgment interest, and attorney's fees;

(b)     grant such other relief as this Court may deem appropriate.

**Jury Demand**

Errato demands a trial by jury by the maximum number of jurors permitted by law with respect to the Third-Party Complaint claims, to the extent allowed by law.

Respectfully submitted,

ROBERT ERRATO and UNITE SOCIAL, LLC

By Their Attorneys,

/s/ *Michael J. Racette*
Michael J. Racette, BBO #555350
mracette@morrisonmahoney.com
MORRISON MAHONEY LLP
250 Summer Street
Boston, MA 02210-1181
Phone:     617-439-7500
Fax:         617-342-4917

23

## CERTIFICATE OF SERVICE

I hereby certify that on this same date, a copy of the foregoing was filed electronically and served by mail on anyone unable to accept electronic filing.  Notice of this filing will be sent by e-mail to all parties by operation of the Court's electronic filing system or by mail to anyone unable to accept electronic filing as indicated on the Notice of Electronic Filing.  Parties may access this filing through the Court's CM/ECF System.

By: /s/ Michael J. Racette
Michael J. Racette